IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MONTRELL LEONARD, a minor by | ) | |
| LAVERN BERNARD, his mother | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 C 6464 |
| | ) | |
| v. | ) | Hon. Michael T. Mason |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff, a minor child, Montrell Leonard ("Montrell" or "claimant"), by his mother,

Lavern Bernard, seeks judicial review [19] of the final decision of the Commissioner of

the Social Security Administration (the "Commissioner") denying his claim for disability

benefits under the Social Security Act (the "Act").  The Commissioner filed a response

[24] arguing that this Court affirm the decision of the Administrative Law Judge ("ALJ").

We have jurisdiction to hear this action pursuant to 42 U.S.C. § 405(g).  For the reasons

set forth below, claimant's request for summary judgment is granted in part and denied

in part, and this case is remanded back to the Social Security Administration (the

"Administration") for further proceedings consistent with this opinion.

1

## I. BACKGROUND

### A. Procedural History

Claimant filed an application for supplemental security income ("S.S.I.") benefits on August 17, 2005. (R. 105-09.) That application states that claimant has been disabled since the date of his birth, August 26, 1999. (R. 106.) An undated disability report reiterates the August 26, 1999 start date of claimant's disability, and states that his disability consists of a bone cyst in his left femur. (R. 124.) The record reflects that claimant fractured his left femur in June 2005. (R. 183-85.) The Administration denied claimant's request for benefits on October 7, 2005. (R. 65-68.) Claimant filed a timely request for reconsideration, which was denied administratively on February 10, 2006. (R. 69, 139-45, 70-72.) Montrell then filed a timely request for a hearing. (R. 75.) On January 16, 2008, claimant appeared with counsel for a hearing before ALJ Janice M. Bruning ("ALJ Bruning"). (R. 28-62.) ALJ Bruning issued a decision denying claimant's request for S.S.I. benefits on May 9, 2008. (R. 13-24.) The Appeals Council denied claimant's request for review on October 1, 2008, and ALJ Bruning's decision became the final decision of the Commissioner. (R. 1-3); *Hopgood v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009); *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998); 20 C.F.R. § 416.1481. Claimant subsequently filed this matter in the District Court.

### B. Medical History

On June 27, 2005, Montrell received treatment from the MacNeal Hospital emergency department after falling "from a porch to the ground." (R. 184.) According to the attending physician, Montrell's fall resulted in a pathologic fracture – when the

bone breaks in an area that is weakened by another disease process – of his left femur. (R. 184, 185.) The attending also noted that claimant's mother reported that she had "noticed for several months that [Montrell] seem[ed] to be limping on his left side." (R. 184.) On that same date, Montrell was transferred to Loyola University Medical Center. (R. 185.) His treating physicians at Loyola diagnosed a pathologic subtrochanteric femur fracture, performed a "90/90 traction," and applied a hip SPICA cast. (R. 232.) They also placed an external fixation pin in his fractured hip. (R. 234-35.)

Dr. Deirdre Ryan ("Dr. Ryan") removed the pin and SPICA cast on July 21, 2005. (R. 224.) At that time, Dr. Ryan described Montrell as "a 5-year-old who was admitted approximately three weeks ago with a pathologic fracture through the left proximal femur through what characteristically appeared on the radiograph as a unicameral cyst." (R. 225.) The following day, she discharged Montrell with directions to maintain non-weight-bearing status and use over-the-counter Motrin and "home meds" as needed for pain. (R. 209, 232.)

Montrell met with Dr. Ryan for a follow-up appointment on August 15, 2005. (R. 222.) After reviewing x-rays of Montrell's left hip, Dr. Ryan found "progressive healing at his fracture site and maintenance of his alignment." (*Id.*) She scheduled Montrell for an aspiration to confirm that "this is a cyst." (*Id.*) If Montrell did, in fact, have a unicameral bone cyst, Dr. Ryan planned to "proceed with an injection procedure where we aspirate bone marrow, combine it with demineralized bone matrix and inject it." (*Id.*) The doctor informed Montrell and his mother of the risks of the procedure, including "infection, blood loss, nerve damage, arterial damage, refracture, [and] need for further injections." (*Id.*) Dr. Ryan also presented alternative treatment options, including

3

placing hardware. (*Id.*) Claimant's mother elected to proceed with the injections, "understanding that [Montrell] may require multiple injections and she is going to have to limit his activity for months to years depending on how he heals." (*Id.*)

On August 22, 2005, Montrell underwent an intraoperative fluoroscopy exam. (R. 217.) According to the reviewing radiologist, the fluoroscopic views of Montrell's left hip "show cystic lesion intertrochanteric region left proximal femur with progressive placement of hardware and radiopaque material within the cyst." (*Id.*) The radiologist further opined that x-rays of claimant's pelvis revealed a "well formed acetabula bilaterally," a "healing subtrochanteric fracture of the left proximal femur," and a "normal" right hip. (R. 216.)

Montrell saw Dr. Ryan for follow-up care on September 19, 2005, "one month after his aspiration and injection of his [unicameral bone cyst]." (R. 261.) The doctor noted that Montrell had maintained non-weightbearing status since his surgery and had "no complaints." (*Id.*) Upon examination, Dr. Ryan observed that Montrell had "no pain with internal or external rotation" or "with flexion or extension." (*Id.*) Dr. Ryan opined that Montrell was "doing well" and elected to "advance him to full weightbearing with physical therapy." (*Id.*) Dr. Ryan informed claimant's mother that he should not be "running, jumping, climbing, bicycl[ing]," or engage in any activity "where he could twist his leg and fall as he is at risk for refracture." (*Id.*)

In connection with Montrell's claim for S.S.I. benefits, Dr. Virgilio Pilapil, a state agency reviewing physician, ("Dr. Pilapil"), reviewed claimant's medical records and completed a childhood disability evaluation form on September 29, 2005. (R. 237-42.) That form required Dr. Pilapil to evaluate claimant's functioning in six domains and

opine as to Montrell's functional limitations, if any. (R. 239-40.) Dr. Pilapil found that claimant had "no limitations" in the first through third domains. (R. 239.) Dr. Pilapil opined that claimant had "less than marked" limitations in the fourth domain, moving about and manipulating objects. (R. 240.) He indicated that claimant had "limited mobility due to [fracture] of left femur." (*Id.*) Dr. Pilapil also found claimant had less than marked limitations in the fifth domain, caring for yourself, due to the fracture. (*Id.*) Finally, Dr. Pilapil determined that claimant had marked limitations in the sixth domain, health and physical well-being, as a result of his June 2005 fracture. (*Id.*) He noted that "[r]ecovery time with limited activity is projected to be months to years depending on how [claimant] heals." (*Id.*) Dr. Pilapil indicated that claimant "does not meet the duration requirement," explaining that the "severity of [his] condition [is] not expected to last 12 months." (R. 237, 242.) On February 9, 2006, an agency consultant, Gotanco Reynaldo, confirmed Dr. Pilapil's findings. (R. 264-69.)

Montrell and his mother returned to Dr. Ryan on October 10, 2005. (R. 250-51.) Dr. Ryan noted that claimant had "no complaints." (R. 251.) During the examination, Montrell had "excellent range of motion" and "full flexion and extension of his hip." (R. 250, 251.) Dr. Ryan again noted that Montrell was "doing well" and cleared him to return to school. (R. 250.) However, she ordered Montrell to "refrain from sporting activities, athletics, running, recess, and playing on the playground" as these activities could result in refracture. (R. 250, 251.) Two months later, on December 16, 2005, Montrell returned for a follow-up and again reported "no pain." (R. 249.) Dr. Ryan found "full flexion and extension of his hip" during examination. (*Id.*) She observed that Montrell's cyst had enlarged and ordered another injection. (R. 249-50.) The doctor

also recommended that Montrell maintain the aforementioned activity restrictions.  (*Id.*)

Montrell underwent his second "aspiration cystogram, irrigation and injection of unicameral bone cyst of the left proximal femur" on January 4, 2006.  (R. 287-89.)  Dr. Ryan's post-operative diagnosis was bone cyst left proximal femur.  (R. 289.)  She prescribed Acetaminophen-Codeine for discomfort and Ibuprofen.  (R. 254, 271.)

Montrell returned to Dr. Ryan on January 9, 2006.  (R. 318-19.)  Montrell had no complaints and his mother reported "that he has been doing well."  (R. 318.)  The doctor found "no pain with range of motion of his leg."  (R. 319.)  Dr. Ryan again instructed "no running, no jumping, no climbing as he could refracture."  (R. 319.)  On March 6, 2006, Montrell appeared for follow-up care and again denied any pain.  (*Id.*)  Upon exam, Dr. Ryan observed that claimant had "full flexion and extension of his hip with full internal and external rotation without any pain."  (*Id.*)  Dr. Ryan gave Montrell a note to "continue to keep him out of gym as he is at risk for fracture."  (*Id.*)

On August 4, 2006, Dr. Ryan reviewed x-rays taken that day and observed a "small area" that was "starting to look a little cystic again."  (R. 317.)  She recommend additional x-rays in two months.  (*Id.*)  Montrell returned on October 2, 2006.  (R. 316-17.)  Dr. Ryan observed that on "repeat x-rays" Montrell was "demonstrating ... a slight expansion in his cyst."  (R. 316.)  Her exam revealed that Montrell was "nontender to palpation" and had "no pain with range of motion."  (*Id.*)  She opined that claimant "would benefit from a repeat injection."  (*Id.*)  Because she was "leaving town," Dr. Ryan referred Montrell for further treatment to her partner, Dr. Timothy Rapp ("Dr. Rapp"), who "specializes in bone tumors and bone cyst[s]."  (R. 317.)

Additional x-rays of Montrell's pelvis were taken on October 2, 2006.  (R. 325.)

According to the reviewing radiologist, when compared to the August 4, 2006 films, the x-rays revealed "no change in the unicameral bone cyst." (*Id.*)  Additional x-rays of claimant's left hip taken October 17, 2006 revealed "a lytic expansile lesion in the proximal shaft of the left femur extending into the femoral neck consistent with a unicameral bone cyst."  (R. 324.)  The radiologist also noted that "[t]he pathologic fracture involving this lesion has completely healed."  (*Id.*)

Claimant first met with Dr. Ryan's partner, Dr. Rapp, on October 17, 2006.  (R. 315-16.)  Dr. Rapp reviewed the x-rays taken earlier that day and observed "continuing thinning of the proximal femoral cortical bone."  (R. 316.)  He noted that Montrell stated he has been limping more recently, that he walked with a "slightly antalgic gait," and that he denied pain with "symmetric hip flexion to 110 degrees, 20 degrees of internal rotation, 40 degrees of external rotation."  (*Id.*)  "[R]ather than perform a large keratage with potential for growth plate or problems," Dr. Rapp "recommended another trial of bone marrow injection mixed with DVX."  (*Id.*)  Dr. Rapp performed the iliac crest bone graft and demineralized bone mix injection procedure on November 29, 2006.  (R. 311-12.)  The doctor's post-operative plan was "to allow [Montrell] to return to activity as tolerated," but to keep him "somewhat quiet over the next couple weeks."  (R. 312.)

Montrell returned for a follow-up appointment on January 25, 2007, six weeks post-injection.  (R. 309.)  According to Dr. Rapp's notes, Montrell was "without pain" at that time.  (*Id.*)  Claimant's grandmother also reported that Montrell had "no limp or pain" and that he had "been running and jumping at home."  (*Id.*)  Dr. Rapp observed that Montrell had a steady gait, and that jumping on both legs did not cause any pain.  (*Id.*)  Upon examination, Dr. Rapp was able to "internally rotate [Montrell's] hip to 30

degrees," with "external rotation of 50 degrees, flexion to 150 degrees without pain or difficulty." (*Id.*)  Dr. Rapp recommended against "jumping or running at home," but authorized Montrell to "do other activities." (*Id.*)

On March 8, 2007, Montrell returned to Dr. Rapp for follow-up.  (R. 338-39.)  He had no complaints, limp, or pain.  (R. 339.)  Dr. Rapp classified Montrell's exam as "benign" and noted that he walked "with a normal gait." (*Id.*)  He recommended a routine follow-up in four months with repeat radiographs, and sooner if there were problems.  (*Id.*)

On Dr. Rapp's order, Montrell received an x-ray of his left hip on August 9, 2007.  (R. 471.)  The reviewing radiologist compared that film with Montrell's March 8, 2007 x-ray[1] and noted an "expansile lytic trabeculated lesion consistent with unicameral bone cyst in the intertrochanteric region of the left proximal femur" that was "slightly wider than on the prior exam." (*Id.*)  Also on August 9, 2007, Montrell had a follow-up appointment with Dr. Rapp.  (R. 463-64.)  Claimant reported an "[e]xcellent energy level" and denied any pain.  (R. 463.)  Dr. Rapp observed Montrell had a normal gait, could jump on his leg without pain or difficulty, and had no pain with hip motion.  (R. 463-64.)  The doctor reviewed the results of the x-ray and noted "some cyst consolidation." (R. 464.)  Dr. Rapp opined that "given [Montrell's] lack of symptoms and reasonable radiograph response," he did not need further injections at that point, and was to return in six months, or sooner if needed. (*Id.*)  He continued to recommend against impact activities.  (*Id.*)

---

[1] The results of the March 8, 2007 x-rays are not included in the record.

Montrell returned to the emergency room on September 29, 2007. (R. 517-27.) The emergency room records reflect that Montrell fell while running away from a dog. (R. 525.) That fall caused Montrell immediate pain, and left him unable to bear any weight on his left side. (R. 517.) According to the treating physician, images of Montrell's left pelvis revealed a "pathological fracture through the intertrochanteric unicameral bone cyst" as well as a "new inferior cortical bone fragment." (R. 518.) Montrell was admitted for treatment, given IV morphine for pain, ordered to maintain non-weightbearing status, and placed on strict bed rest. (R. 521, 526-27.)

On October 17, 2007, Dr. Rapp examined claimant under anesthesia and performed a left hip aspiration and injection of demineralized bon matrix and iliac crest bone marrow. (R. 486.) He found that Montrell's fracture was "stable through a full range of motion" and "appeared to be healing well." (*Id.*) The doctor injected a slurry of bone marrow mix through two separate portals into Montrell's lateral proximal femur. (*Id.*) Dr. Rapp's post-operative plan was to "readmit [Montrell] for pain control. He will remain strictly touch-down weightbearing only. He will likely require a wheelchair given his tenuous status with crutches, although this may be possible for him for short transfers around the home." (*Id.*) That same day, Dr. Rapp discharged Montrell with a wheelchair "for the next few weeks." (R. 490.)

Montrell returned to Dr. Rapp on November 6, 2007. (R. 484-85.) Dr. Rapp determined that Montrell had "100 degrees of hip flexion, 10 degrees of internal rotation and 30 degrees of external rotation without pain." (R. 485.) Upon exam, the doctor noted that Montrell could place equal weight on both legs without "obvious pain." (*Id.*) Dr. Rapp recommended that Montrell "go back to school in a wheelchair at all times,"

since the doctor "would hate to push the envelope here." (*Id.*) He further opined that if Montrell continued to "show consolidation and has no pain [in 2 to 3 weeks], he could progress his weightbearing with a walker." (*Id.*) Three weeks later, on November 27, 2007, Dr. Rapp "recommended discontinuing the wheelchair, weightbearing as tolerated, no jumping or impact sports." (R. 482.) The doctor also noted Montrell's "radiographs show continued consolidation" and that he denied any pain. (*Id.*) Montrell returned for further treatment on January 8, 2008. (R. 483.) At that time, Dr. Rapp opined that Montrell walked with a "normal gait" and "his radiographs show consolidation within the cyst." (*Id.*) Dr. Rapp recommended "continued light activity. No jumping or running." (*Id.*)

## C. Testimony

### 1. Testimony of Claimant

Montrell appeared with counsel and testified before ALJ Bruning at the January 16, 2008 hearing. (R. 33-45.) At the time of the hearing, Montrell was eight years old and in the third grade. (R. 33.) He lived at home with his mother and thirteen year old brother. (R. 35-36.) Montrell testified that after his second injury, he was not allowed to walk, and was in a wheelchair until approximately one month earlier. (R. 39-40.)

Montrell stated that he did not participate in gym class. (R. 36.) He had missed time from school because he was "in the hospital." (R. 39.) He stated that he does not ride a bike, roller skate, or go outside and run with his friends. (R. 37-38.) Montrell denied having any difficulty doing chores, but also admitted that he sometimes needs to sit down and rest. (R. 38.) When questioned about pain, Montrell responded that he does not have pain when walking. (R. 40.) According to Montrell, he cannot walk as

fast as other kids, and rests after walking "a few steps" for "like, for 10, 20 minutes." (R. 41.) He stated that when walking, he takes care to not fall down. (R. 43.) Montrell initially denied taking any pain medication. (R. 38.) However, when questioned by his counsel, Montrell explained that he takes medication "sometimes." (R. 43.)

### 2. Testimony of Claimant's Mother

Claimant's mother also testified at the hearing. (R. 45-58.) She stated that Montrell walks with a limp, and that his doctors told her that "one leg ... may be shorter than the other one because the way they have to operate on it." (R. 56.) She testified that Montrell was able to attend to his hygiene, but that she has to watch and "half-way help him" in the bathtub because she does not want him falling. (R. 52.) She stated that Montrell has received steroid injections and takes "medication" when "it hurt[s]." (R. 56-57.) He received Tylenol with codeine as a pain medication after surgery. (R. 47.) Claimant's mother explained that she does not "too much believe in giving him all that stuff, so – especially with that codeine, because it make him sleep the whole day. Not partial. He'll sleep the whole day." (R. 57.) If Montrell can "deal" with the pain, she'll "let him." (*Id.*) "But if it's excruciating pain, [she'll] give him the codeine," since "he'll take it if [she] make[s] him." (*Id.*)

### 3. Testimony of Dr. Larry Kravitz, Ph.D.

Dr. Larry Kravitz, Ph.D. ("ME Kravitz") testified as the medical expert at the hearing. (R. 58-62.) ME Kravitz is a psychologist. (R. 58.) He did not meet or examine Montrell, but rather reviewed the medical records in the case file. (R. 58-59.) ME Kravitz did not find any mental impairments documented in those records. (R. 59.) The ME further explained that he examined Montrell's medical records from a psychological viewpoint, not a physical viewpoint. (R. 60.) He opined that Montrell was "doing real well, given what he's having to go through." (*Id.*)

## II. LEGAL STANDARD

### A. Standard of Review

This Court must uphold the ALJ's decision "if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007) (citations omitted); *see also* 42 U.S.C. § 405(g). As the Seventh Circuit has explained, an ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and articulates his assessment of the evidence, "build[ing] a logical bridge from that evidence to the conclusion." *Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the [ALJ]." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 836, 869 (7th Cir. 2000)). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940

(7th Cir. 2002).

**B.    Analysis Under the Act**

To qualify for S.S.I. benefits, Montrell must be disabled under the Act.  "An individual under the age of 18 shall be considered disabled ... if [he] has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and ... which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  Whether a child meets this definition requires a three-step analysis.  20 C.F.R. § 416.924(a).  Under that analysis, the ALJ must determine: (1) whether the child is engaged in substantial gainful activity (if he is, his claim will be denied); (2) whether the child has a severe impairment or combination of impairments (if he does not, then he is not disabled and his claim will be denied); and (3) whether the child's impairment meets a duration requirement and meets, medically equals or functionally equals, the severity of any of the Listing of Impairments contained in 20 C.F.R. pt. 404, subpt. P, App. 1 (the "listings").  20 C.F.R. § 416.924(a-d); *Hopgood*, 578 F.3d at 699; *Giles*, 483 F.3d at 486-87.

ALJ Bruning followed that three-step analysis.  (R. 13-24.)  At step one, ALJ Bruning found that "claimant has not engaged in substantial gainful activity at any time relevant to this decision."  (R. 16.)  At step two, ALJ Bruning determined that "claimant has the following severe impairments: status post fracture of the left femur in June 2005, status post surgery left femur proximal bone cyst in January 2006, and status post left hip fracture in September 2007."  (*Id.*)  At step three, ALJ Bruning found that claimant's impairments did not meet, or medically or functionally equal, the severity of a

13

listed impairment.  (R. 16-24.)  The ALJ concluded that "the claimant has not been disabled, as defined in [the Act], since August 17, 2005, the date the application was filed."  (R. 24.)

Claimant asks this Court to find that the ALJ erred in her analysis.  First, claimant argues that the ALJ's conclusion is incorrect because she ignored evidence that claimant's injury either met, medically equaled, or functionally equaled, a listing. Second, claimant asserts that the ALJ committed reversible error by failing to obtain an updated medical opinion on medical equivalency.  Third, claimant argues that the ALJ committed reversible error in failing to conclude that claimant had functional limitations in two domains.  Finally, claimant challenges the ALJ's finding that the testimony of claimant's mother, Lavern Bernard, was not entirely credible.  We address each argument in turn.

## III.   ANALYSIS

### A.   The ALJ's Medical Equivalence Determination is Supported by Substantial Evidence.

Claimant argues, without citation to supporting case law, that the ALJ erred at step three by failing to recognize that the injury to his leg medically equals a musculoskeletal listing.  Under the guidelines, to medically equal such a listing, claimant must show an inability to ambulate lasting at least twelve months.  20 C.F.R. pt. 404, subpt. P, App. 1, § 101.00B2.  Claimant cites to evidence that he continued to receive medical attention more than two years after his original injury in June 2005, and contends that this fact establishes equivalence.  Claimant also relies on Dr. Pilapil's observation that "[r]ecovery time with limited activity is projected to be months to years

depending on how [Montrell] heals." (R. 240.)

This Court is not persuaded by claimant's arguments regarding the ALJ's medical equivalence determination. Claimant's continued medical care is not dispositive. As the ALJ recognized, under the relevant listing, an inability to ambulate effectively "must have lasted, or be expected to last, for at least 12 months." 20 C.F.R. pt. 404, subpt. P, App. 1, § 101.00B2a. ALJ Bruning opined that "the record fails to show that the claimant is unable to ambulate effectively for at least twelve continuous months" because, after both the June 2005 and the September 2007 injuries, "claimant regained the ability to ambulate effectively well within twelve months." (R. 16.) Claimant has not provided any evidence that his inability to ambulate effectively lasted for at least twelve continuous months. As for claimant's contention that the ALJ erred in failing to credit Dr. Pilapil's observation regarding recovery time, that argument ignores Dr. Pilapil's ultimate conclusion that claimant did not meet the duration requirement because the severity of his condition was not expected to last twelve months. (R. 237, 242.) Claimant has not shown an "extreme limitation of the ability to walk" or the need of hand-held devices for a period of at least twelve months. 20 C.F.R. pt. 404, subpt. P, App. 1, § 101.00B2b(1). Accordingly, we cannot conclude that the ALJ erred in finding that the "record fails to show that the claimant is unable to ambulate effectively for at least twelve continuous months," and determining as a result that "claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments," because claimant "does not manifest clinical signs and findings that meet the specific criteria of any of the Listings, including the musculoskeletal listings for adults and children." (R. 16.)

15

Ultimately, substantial evidence supports ALJ Bruning's conclusion that claimant's injury does not medically equal a listing. With respect to claimant's fracture in June 2005, the ALJ relied on Dr. Ryan's observation that claimant's October 10, 2005 x-rays demonstrated complete healing of that fracture. (R. 18, 222, 240, 251.) The ALJ also noted that claimant's March 2006 progress notes reflect that claimant was "doing well with no complaints, had full flexion and extension of his hip, and full internal and external rotation without pain." (R. 18, 318.) Additionally, ALJ Bruning relied on claimant's progress notes for January 2007 showing that claimant "had no limp or pain and had been running and jumping." (R. 18 , 309, 465.) While not discussed by ALJ Bruning, Dr. Pilapil's ultimate conclusion in his childhood disability evaluation form also supports her conclusion with respect to claimant's June 2005 injury. Finally, ALJ Bruning credited Dr. Rapp's opinion on August 9, 2007 that "given the claimant's lack of symptoms and reasonable radiograph response, he did not need further injections at that point and was to return in six months." (R. 18, 332-408.)

As for claimant's September 2007 injury, ALJ Bruning noted that as of November 6, 2007, claimant was released to return to school in a wheelchair. (R. 18.) ALJ Bruning also notes that "by January 8, 2008, the claimant was walking with a normal gait and had no pain complaints" and that Dr. Rapp noted "that the radiographs showed consolidation with the cyst." (R. 18-19, 543.) Thus, ALJ Bruning's determination that claimant's impairment did not meet or medically equal one of the listings is supported by sufficient evidence and will not be overturned. *See Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) (finding that the ALJ's finding was supported by substantial evidence where "the record as a whole supports the ALJ's conclusion").

**B.    ALJ Bruning was Not Required to Obtain an Updated Medical Opinion, but Should Have Articulated Her Consideration of the State Agency Reviewing Physician's Medical Opinion.**

Claimant argues that ALJ Bruning committed reversible error by failing to obtain an updated medical opinion before concluding that claimant's condition did not meet or equal a listing.  Claimant cites Social Security Regulation ("S.S.R.") 96-6p, as well as Chapter I-5-4-30 of the Hearings, Appeals and Litigation Law Manual ("HALLEX"), a Social Security Administration policy manual.  Claimant contends that S.S.R. 96-6p "requires the ALJ to obtain an updated medical opinion from medical experts that could modify state agencies medical consultant findings [sic]."  He also argues that HALLEX Chapter I-5-4-30  "requires the ALJ to obtain opinions on medical equivalents from medical experts in children's disability cases."  In response, the Commissioner argues an updated medical opinion was not necessary because the ALJ's finding was supported by the childhood disability evaluation form completed by Dr. Pilapil, a state agency reviewing physician, as well as two Disability and Determination Transmittal forms completed by other state agency physicians.  The Commissioner also contends that S.S.R. 96-6p does not require an updated medical opinion under the circumstances here.

Claimant correctly contends that an ALJ must obtain opinions on medical equivalence from medical experts.  S.S.R. 96-6p, 1996 WL 374180, at *3; HALLEX Chapter I-5-4-30, Attachment 1, Questions & Answers, No. 5.  As noted above, state agency physician Dr. Pilapil completed claimant's childhood disability evaluation form on September 29, 2005.  (R. 237-42.)  Dr. Pilapil opined that claimant "does not meet the duration requirement" because the severity of his condition was not expected to last

twelve months.  (R. 237, 242.)  An ALJ may properly rely on state agency medical opinions.  *See, e.g., Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (holding that when an agency's physicians find that a claimant is not disabled in a Disability Determination and Transmittal form, "[t]he ALJ may properly rely upon the opinion of these medical experts."); *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990) (holding that "[s]ince the state agency physician was a physician designated by the Secretary to determine medical equivalence, the ALJ may rely upon the physician's opinion to determine eligibility."); *cf. Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (noting that *Scheck* "makes clear that the ALJ may rely solely on opinions given in Disability Determination and Transmittal forms and provide little additional explanation only so long as there is no contradictory evidence in the record").

The Commissioner urges this Court to affirm the ALJ's finding regarding medical equivalence based on Dr. Pilapil's report.  However, ALJ Bruning made no mention of Dr. Pilapil's report in her decision.  As a result, we cannot determine whether the ALJ did, in fact, consider that doctor's expert medical opinion, much less endorse or reject it. "The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence."  *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985); *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002) ("Though the ALJ need not address every piece of evidence, he must articulate, at some minimum level, his analysis of the record so that the reviewing court can follow his reasoning."). Accordingly, we cannot affirm the ALJ's opinion on that basis, because we are "left to wonder" whether the ALJ considered this evidence.  *See Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003).

It is indisputable that administrative law judges must consider agency experts' opinions regarding medical equivalence. "[L]ongstanding policy requires that the judgment of a physician ... designated by the Commissioner on the issue of the equivalence on the evidence before the administrative law judge ... must be received into the record as expert opinion *and given appropriate weight*." S.S.R. 96-6p, 1996 WL 374180, at *3 (emphasis added). Further, while "[a]dministrative law judges ... are not bound by findings made by State agency or other program physicians ... *they may not ignore these opinions and must explain the weight given to the opinions in their decisions*." S.S.R. 96-6p, 1996 WL 374180, at *2 (emphasis added). ALJ Bruning's failure to discuss Dr. Pilapil's report thus requires remand.

With respect to claimant's argument that ALJ Bruning should have obtained an updated medical opinion, that argument is necessarily impacted by this Court's finding that the ALJ must articulate her consideration of Dr. Pilapil's opinion on remand. However, the Court notes that, had the ALJ properly articulated her consideration and reliance upon Dr. Pilapil's opinion, the record would have otherwise supported her decision not to obtain an updated opinion. As set forth in S.S.R. 96-6p, an ALJ must obtain an updated medical opinion from a medical expert before making a disability decision based on medical equivalence when: (1) "in the opinion of the [ALJ] ... the symptoms, signs, and laboratory findings reported in the case suggest that a judgment of equivalence may be reasonable"; or (2) "[w]hen additional medical evidence is received that in the opinion of the [ALJ] ... may change the State agency medical ... consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." S.S.R. 96-6p, 1996 WL 374180, at *4. "In

both circumstances the ALJ must be of the opinion that a finding of medical equivalence may be reasonable." *Young v. Apfel*, No. 98 C 1058, 1999 WL 354776, at *6 (N.D. Ill. May 27, 1999). HALLEX Chapter I-5-4-30 does not state anything to the contrary.

For a finding of medical equivalence under § 101.06, the appropriate listing for claimant's condition, Montrell was required to show evidence of "A. Solid union not evident on appropriate medically acceptable imaging, and not clinically solid; and B. Inability to ambulate effectively, as defined in 101.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset." 20 C.F.R. pt. 404, subpt. P, App. 1, § 101.06. The "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. pt. 404, subpt. P, App. 1, § 101.00B2b(1). Further, under the guidelines, "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning ... to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.*

Had claimant presented medical evidence showing that he met or medically equaled this (or any other) listing, ALJ Bruning would be required to obtain an updated additional medical opinion. However, as previously discussed, ALJ Bruning found that claimant "does not manifest clinical signs and findings that meet the specified criteria of any of the Listings, including musculoskeletal listings for adults and children," because the medical evidence presented by claimant did not show that he was unable to ambulate for at least twelve continuous months. (R. 16.) In support of this finding, ALJ Bruning noted that the medical records show that "[a]fter the June 2005 fracture and

20

again in September 2007, claimant regained the ability to ambulate effectively well within twelve months." (*Id.*) ALJ Bruning also found that after the September 2007 injury, Dr. Rapp "allowed [claimant] to be weight bearing November 27, 2007, roughly two months after his fracture of the left hip." (R. 18.) Further, ALJ Bruning noted that by January 8, 2008, Montrell "was walking with a normal gait and had no pain complaints," and that Dr. Rapp found that his "radiographs showed consolidation with the cyst." (R. 18-19, 460-542.)

As a result, there is no basis for this Court to find that ALJ Bruning committed reversible error by failing to obtain an updated medical opinion before determining that claimant's condition did not meet or medically equal any listing. *See Young*, 1999 WL 354776, at *6 (ALJ did not err in deciding not to obtain an updated medical opinion because substantial evidence supported his decision that the record did not "suggest" a finding of equivalence). However, on remand, ALJ Bruning must articulate her consideration of Dr. Pilapil's report and explain the weight given to his expert opinion in her decision.

### C. The ALJ's Finding that Claimant is Less than Marked in the Sixth Domain Lacks Sufficient Explanation.

As noted above, under step three of the determination of whether a minor is disabled, the ALJ must determine, among other things, whether the child's impairment meets, medically equals or functionally equals, the severity of a listing. To determine whether an impairment is the functional equivalent of a listing, the ALJ must assess an impairment's severity in six domains: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and

21

Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1). Functional equivalence exists, qualifying a child for benefits, if the ALJ finds "marked" difficulty in two domains of functioning, or an "extreme" limitation in one. 20 C.F.R. § 416.926a(e). In assessing whether the claimant has "marked" or "extreme" limitations, the ALJ must consider the functional limitations from all medically determinable impairments, including any impairments that are not severe. *Id.* The ALJ must also consider the interactive and cumulative effects of the claimant's impairment or multiple impairments in any affected domain. 20 C.F.R. § 416.926a(a), (c).

Under the Act, a "marked" limitation exists when the impairment seriously interferes with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "Marked" is also defined as meaning that the limitation is "more than moderate" but "less than extreme." *Id.* An "extreme" limitation exists when a child's "impairment(s) interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). A child's "day-to-day functioning may be very seriously limited when [the child's] impairment(s) limits only one activity or when the interactive and cumulative effects of [the child's] impairment(s) limit several activities." *Id.* "Extreme" is also defined as meaning that the limitation is "more than marked." *Id.*

ALJ Bruning concluded that claimant had marked functional limitations in the fourth domain, Moving About and Manipulating Objects, and less than marked limitations in two other domains, the fifth, Caring for Yourself, and the sixth, Health and Physical Well-Being. (R. 22-24.) Claimant challenges ALJ Bruning's findings with

respect to the sixth domain, Health and Physical Well-Being, as being inconsistent and contrary to the medical evidence, including the report of state agency reviewing physician Dr. Pilapil. Claimant also argues that "the testimony of the parties regarding the pain, the weakness, the inability to take gym, and the reduced use of the leg, all result in a marked condition in the sixth domain." Finally, claimant contends that the ALJ's finding of marked limitations in the fourth domain required a finding of marked limitation in the sixth domain.

The sixth domain, Health and Physical Well-Being, involves a consideration of the cumulative physical effects of physical and mental impairments and their treatments on the child's health and functioning. S.S.R. 09-8p. "[T]his domain does not address typical development and functioning," but rather, how such things as recurrent illness, the side effects of medication, and the need for ongoing treatment affect a child's body; that is, the child's health and sense of physical well-being." *Id.*

Here, ALJ Bruning found that "other than the claimant's history of fractures and resulting marked limitation ... in the [fourth] domain of Moving About and Manipulating Objects, the claimant does not have any other physical problems. The claimant does have to be careful with his physical activities so as not to reinjure himself." (R. 24.) However, in making this finding, ALJ Bruning did not explain her basis for discrediting Dr. Pilapil's finding that claimant's initial fracture and treatment resulted in marked limitation in the sixth domain. (R. 240.) Indeed, as discussed above, ALJ Bruning's opinion did not make any mention of Dr. Pilapil's report. ALJ Bruning's failure to discuss Dr. Pilapil's finding of marked impairment in the sixth domain warrants remand, particularly given the ALJ's finding of marked limitation in the fourth domain. *See Grady*

23

*v. Astrue*, No. 07-421, 2008 WL 2397583, at *8 (S.D. Ill. June 10, 2008) (remanded with instructions to further articulate findings where the ALJ did not explain why a doctor's professional assessment was inadequate or overcome by other evidence); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) (noting that the ALJ must discuss all relevant evidence).  (R. 22.)  On remand, ALJ Bruning must also discuss Dr. Pilapil's expert opinion in connection with her discussion of functional equivalence, and, if applicable, articulate her basis for disregarding Dr. Pilapil's finding regarding the sixth domain.

### D.    The ALJ Must Articulate Her Credibility Determination.

Finally, claimant asserts that ALJ Bruning erred in failing to credit the testimony of his mother.  Generally, this Court will defer to the ALJ's credibility determination.  It is well established that the ALJ is "in the best position to see and hear the witnesses and assess their forthrightness."  *Jens*, 347 F.3d at 213.  Thus, this Court will afford an ALJ's credibility determination special deference, and will overturn the determination only if it is "patently wrong."  *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (noting that reviewing courts "should rarely disturb an ALJ's credibility determination.").

After considering the evidence in the record, ALJ Bruning found that "claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the statements concerning the intensity, duration and limiting effects of the claimant's symptoms are not entirely credible."  (R. 19.)  Claimant asserts, without citing any supporting authority, that a medical expert is needed to

24

determine if claimant's mother is credible in reporting on claimant's injury. For the reasons discussed above, as well as claimant's failure to cite any authority in support, we do not credit this argument. However, we do conclude that remand is warranted because ALJ Bruning did not set forth specific reasons for her credibility determination.

As ALJ Bruning correctly recognized, a credibility determination is guided in part by 20 C.F.R. § 416.929(c). (R. 17.) The ALJ must also comply with the requirements of S.S.R. 96-7p. *Brindisi*, 315 F.3d at 787 (*citing Steele*, 290 F.3d at 942). S.S.R. 96-7p requires that "[t]he reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186, at *4. Further, S.S.R. 96-7p requires that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision." *Id.*

Claimant does not identify specific testimony that the ALJ failed to credit. However, we note that testimony by claimant's mother does have support in the record. For example, claimant's mother's testimony that Montrell walks with a limp is supported by Drs. Ryan's and Rapp's records. (R. 56.) On January 17, 2006, Dr. Ryan noted that "he does walk with a slightly antalgic gait on this limb." (R. 342.) Dr. Rapp also noted

that Montrell walks "with a slightly antalgic gait on this limb" in his October 17, 2006 notes. (R. 324.) And finally, Dr. Ryan noted that Montrell's Galeazzi sign is slightly positive, supporting claimant's mother's testimony that "one leg was going to be – may, may be shorter than the other one." (R. 56, 316-17.) However, record support for ALJ Bruning's credibility determination also exists. For example, Dr. Rapp's progress notes reflect that Montrell had no limp and walked with a normal and steady gait. (R. 309, 337-38, 345, 463-64.) Additionally, the record conflicts with claimant's mother's testimony about how often Montrell is given codeine for his pain, and how he reacts. Based on this Court's review, the only references in the medical record that reflect Montrell's side effects to medication are in response to morphine IV and hydrocodone and appear in the records during Montrell's hospitalization after the 2007 break. (R. 518-19, 526-27.)

In short, there is evidence that supports, and undercuts, the ALJ's credibility determination. However, because ALJ Bruning did not discuss any inconsistencies regarding claimant's mother's testimony, we cannot affirm her credibility determination. *See Murphy*, 496 F.3d at 635 (the ALJ must give specific reasons for his credibility determination that are supported by the record); *Brindisi*, 315 F.3d at 787 (the ALJ's opinion must comply with S.S.R. 96-7p); *see also Ribaudo*, 458 F.3d at 584 (noting that while an ALJ's credibility determinations are "given special deference," the ALJ must still "build an accurate and logical bridge between the evidence and the result.") (citation omitted). On remand, ALJ Bruning must provide specific reasons for her credibility determination that are grounded in the evidence, and discuss her reasons for discrediting evidence contrary to her conclusion.

## IV.    CONCLUSION

For the reasons set forth above, claimant's request for summary judgment is granted in part and denied in part.  This case is remanded to the Social Security Administration for proceedings consistent with this opinion.  It is so ordered.

ENTERED:

_____
MICHAEL T. MASON
United States Magistrate Judge

Dated: November 10, 2010